## BRACKEN *et al.* vs. PRESTON *et al.*

1. EQUITY — JURISDICTION IN CASES OF TORT. Courts of equity will rarely and only under peculiar circumstances entertain jurisdiction in cases of tort.

2. INJUNCTION. An injunction will be granted to restrain a trespass in order to quiet the possession, or when there is danger of irreparable mischief, or where the value of the inheritance is put in jeopardy by a continuance of the mischief, but in ordinary trespasses, or where the courts of law can give a complete remedy, equity refuses to interfere.

3. SAME. Trespass in digging or mining on the land of another is within the cognizance of a court of equity when committed by a *mere* wrongdoer, or where a party exceeds the limited rights with which he is clothed.

Bracken et al. vs. Preston et al.

4. SAME. In order to justify the interference of a court of equity in all such cases, the complainant must in general be in possession or have established his right at law or brought an action to recover possession, or his exclusive right must be admitted by the defendant, and the court will act in such cases, with great caution.

5. SAME. An injunction will not be allowed in such a case with an account, where the plaintiff cannot maintain an action at law for mesne profits.

6. TRESPASS — DAMAGES. A person disseized cannot maintain trespass, but it might be maintained for the entry and ouster, in which case the damages could be recovered for the entry and ouster only ; but for a continuance of the trespass, damages can be recovered only after the party disseized has regained possession.

7. BILL FOR AN ACCOUNT OF ORE. Where a bill seeks an account of ore dug on the complainant's lands, a court of equity will decree if in a proper case, but the complainant must show that he is in possession.

8. SAME. Although the defendant in such case does not show a legal right to the possession, yet a court of equity having no direct jurisdiction to try legal titles, except in difficult and complicated cases affording some peculiar ground for equitable interference, will not decree that the defendant surrender possession.

9. PLEADINGS AND PROOFS. Every bill must contain sufficient matter of fact of itself to maintain the complainant's case and the proof must correspond with the allegations.

10. BILL HELD DEFECTIVE. Where a bill was brought in a case of continuing trespass, showing that the complainants were disseized, for an injunction pending an action for forcible entry and detainer, and for an account of mineral dug on the premises, and a decree that the defendants surrender possession and that the complainants might be quieted in their title, and it appeared that the defendants were in possession claiming a right thereto working the mine thereon. *Held*, that the bill did not state such a case as entitled the complainants to any relief; that ejectment was the proper remedy with a preliminary injunction on a proper bill showing the pendency of the action at law, and that after a recovery therein the plaintiffs could obtain satisfaction by an action for mesne profits.

11. EVIDENCE — RECEIVER'S RECEIPT. In actions between individuals the receipt of the receiver of a land office is under the statute, sufficient legal evidence of title, though as between the holder of it and the government, the legal title still remained in the United States.

APPEAL from the District Court for *Milwaukee* County.
The complainants, *Charles Bracken, David Irvin, Amelia Daniels, Sarah Daniels* and *Cecilia Daniels* filed their bill in the district court for Iowa county, against *Sylvester B. Preston, William Kendall, William T. Phillips* and *William Nichols*, claiming to be the owners

of a certain tract of land in Iowa county and praying for a decree for an account of mineral taken therefrom by the defendants, and that they be decreed to yield and surrender possession thereof to the complainants, and for an injunction to restrain the defendants from working a copper mine on the premises in question. After the bill had been answered the venue was changed to Milwaukee county and at the hearing the district court of Milwaukee made a decree dismissing the bill, from which *Bracken* appealed. The allegations of the bill and the substance of the answer and evidence are stated in the opinion of the court.

*T. P. Burnett*, for appellant.
*F. J. Dunn*, for appellees.

MILLER, J. The bill of complainants is sworn to by *Charles Bracken*, one of complainants, who is also next friend of *Sarah Daniels* and *Cecilia Daniels*, of Michigan, minor children of Lyman J. Daniels, deceased. *Amelia Daniels* is the widow of said Lyman, deceased. The bill sets forth, that on the 18th day of November, A. D. 1835, *Charles Bracken, David Irvin* and Lyman J. Daniels entered at the land office at Mineral Point in Iowa county, the east half of the north-east quarter of section No. 5 in township No. 4 of range No. 3 east, containing 80 29-100 acres, and the receiver's receipt for the payment of the purchase money of the same date, is presented as evidence, by which the parties became seized as tenants in common of the said land, and as such, have the absolute, sole, and exclusive right, to the use, occupancy, and possession of the said tract of land, and to all the rents, issues and profits of the same; and to all minerals, ore and mineral dirt, of whatever description or kind that were, or might at any time, be or exist in or upon said tract of land: That a very valuable mine of copper ore was discovered upon said land, which said mine has been extensively worked, and a large quantity of copper ore, and of dirt intermixed with copper ore,

has been raised to the surface of the ground from such mine: And after said copper mine had been discovered and worked, and after large quantities of copper ore had been raised as aforesaid, *William Kendall, Sylvester B. Preston, William T. Phillips* and *William Nichols*, without law or right, and contrary to the will of complainants, entered and took possession of said tract, on or about the 25th day of June, 1842, and continued therein until the 20th day of July, A. D. 1842, and refused to permit complainants to take possession of, or in any manner to occupy or enjoy that portion of the said tract embracing said copper mine, and during all that time, took and carried away from the said tract of land large quantities of copper ore, and during all that time converted to their own use the whole of the products of the said copper mine: And that on the said 20th of July, 1842, the said *Charles Bracken*, having quietly and peaceably taken possession of the said tract of land and copper mine, and having left his agent in possession of the same who was quietly and peaceably holding the same, by the authority of the said *Charles Bracken*, and for his use and benefit, the defendants, with force and arms, and with strong hand, unlawfully and forcibly, did again enter upon said land and expel the said agent therefrom, and again took possession of the same; and refused to permit complainants to enter upon the same and occupy said copper mines or take the copper ore, but have converted and are converting the same to their own use, and retain the possession thereof.  On the 2d of August, 1842, *Charles Bracken* made his complaint against the said defendants for forcible entry and detainer upon and of said premises, to a justice of the peace of Iowa county, and a summons was issued returnable on the ninth of the same month, but complainants justly fear, that before the return day of said summons, the said defendants will commit great and irreparable waste upon said premises by removing the said copper ore from said premises, and that they are continually removing the same ; and threat-

en to supersede by certiorari, any writ of restitution complainants may obtain in pursuance of said proceeding in forcible entry and detainer. And complainants greatly fear that defendants will commit great and irreparable waste upon said tract of land before they or either of them can obtain any adequate or permanent relief at law, and pray that defendants may be decreed to surrender up to complainants the quiet and peaceable possession of the said tract of land and copper mine of which they are seized as aforesaid, and all the proceeds of the same ; and that defendants may render an account of the proceeds of said copper mine, and how much of the same they have disposed of and converted to their own use ; and be decreed to pay the same to complainants ; and that the complainants may be quieted in their title to and possession of said premises ; and for such other relief as the nature and circumstances of the case may require.

The defendants' answer was filed in the court of Iowa county on the 4th of February, 1843. They admit that the land aforesaid was entered by *Bracken, Irvin* and Daniels as set forth in the bill, but deny that said entry vested in them the fee of said lands, but that as no patent therefor had been issued, the fee remained in the United States. Admit that *Bracken, Irvin* and Daniels and the said widow and heirs of said Daniels, may have been seized and possessed as set forth in said bill, but aver that they always understood that Arthur Brunson, of New York, to whose agent defendants paid rent, was the owner of the interest of said Daniels. And defendants deny that the complainants had sole and exclusive right thereto during all the time to the filing of the bill ; nor had they the sole right to all the mineral ore on said land, or to mine and dig on the same, but the right of complainants to the sole occupancy of said premises was restricted by their leasing and letting the said premises to many persons to mine and dig upon. The defendants admit there was a valuable discovery of copper ore made on a part of said

tract, but deny that it was made when the complainants were in possession, or had the right of possession to that part of said tract on which said discovery was made. From the time of the entry of said premises until after said discovery was made, by common custom, and by tacit consent of the owners of said tract, the same was at all times open to let and free to be taken up and worked in search of ore, by all and any person who might choose to work the same, by paying the usual rent out of all ore raised on said premises : That Andrew Remphrey (under whom defendants claim) did, some time in the winter of 1841–42, ask of *Charles Bracken*, one of complainants, and who professed to be agent for the other owners, the privilege of mining, digging and searching for ore on said land, and that he gave said Remphrey leave to mine on said land, and to raise and take therefrom all ore he might discover, subject to the condition that Remphrey was to pay to the owners of said premises one-fifth thereof, and said *Bracken* should have the privilege of having the remainder thereof if he would give as high a price and make as good payments as any other person for the same ; said Remphrey at the same time applied to said *Bracken* for a written lease of said premises, but that he answered that a written lease was unnecessary, as there were a sufficient number of witnesses present. Under said lease said Remphrey took as a partner one of the defendants, *William T. Phillips*, because he could not well work alone ; and according to mining custom and rule, and after having made the valuable discovery of copper ore,went on said premises in company with *Charles Bracken* and measured and staked off a lot 200 yards square, or thereabouts, according to the custom of the mines : Some time after the first discovery was made in March, 1842, the said Remphrey and *Phillips* made a very valuable discovery of copper ore on the said premises, at which time and frequently thereafter the said *Bracken* was on the said lot and appeared to be well satisfied with the manner of working the said ground and

the discoveries that had been there made, and the right of the said Remphrey and *Phillips* to the said ores, except the one-fifth rent as aforesaid. And also the other owners or their agents expressed entire satisfaction, after the discovery, of the letting aforesaid. And the said mine was peaceably and quietly worked for a long space of time, and large quantities of copper ore were raised from the same; and portions of it were removed to the most convenient water in order to cleanse and prepare the ore for smelting, which was absolutely necessary. After some time, and before any of the ore so raised was prepared for market, *Bracken* committed such acts of domineering as to indicate an intention to give trouble, when Remphrey sold to *Sylvester B. Preston*, one of the defendants, all his right, title and interest of, in and to the said lot so leased and laid off as aforesaid, and the copper ore discovery thereon, and the mineral then raised, for the sum of $300, which he had a perfect right to do, his interest being the one-half of the lot and discovery, the said *William T. Phillips* owning the other. The said *Nichols* and *Kendall* worked and were on the ground by permission of *Preston* and *Phillips;* and that from the said transfer by said Remphrey to *Preston* (which transfer was a matter that could not have been other than well known to said complainants, *Bracken* and *Irvin*) these defendants worked the said lot and raised therefrom large quantities of copper ore. And after some was washed and prepared for market, they caused notice to be given said *Bracken* by the agent of *David Irvin*, one of complainants, that the said ore that was so raised by said *Phillips*, Remphrey and these defendants, amounting to about 50,000 pounds, was ready for sampling, division and market; and offered at the same time to let said *Bracken* have four-fifths of said mineral owned by said defendants at $16 per thousand, or to give for the other fifth (the rent mineral) the same sum per thousand, when said *Bracken* urged no objection whatever to these defendants occupying said lot and digging and raising ore, but urged as a

reason why he would not give or take $16 per thousand, that he wished some permanent price set on said copper ore that would govern all ore raised on said lot; that these defendants were compelled to be governed by the price of copper and copper ore in the market to regulate the price they could pay for copper ore. Said *Bracken* was also notified, that the ore owned by the defendants was ready for market, but he would not give as good prices for the same, or make as good payments as others would. He offered no price whatever at any time for the ore, nor did or would he offer at the time of the division of the said ore, but the clerk of Curtis Beech, who was, as defendants understood, the agent of two of the owners of said premises, and as such agent, controlling two-thirds of the rent, attended said division, and there was then, and previous to the exhibiting of the bill of complaint at all times a fair division of all ore ready for market that was raised on said lot, which division was acquiesced in by said agent. Defendants continued to occupy and work the mine and raise ore for some short time after the aforesaid division, and to remove the said ore to the wash place to prepare the same for division and market, in hopes that they would be permitted peaceably and quietly to mine and occupy said lot so long as they complied with the terms of letting the same with the privileges of mining to said Remphrey, which these defendants state that they at all times complied with. The said *Charles Bracken*, without right or color of right, on the morning of the 20th of July, 1842, or early in the morning, with his brother John Bracken and Lott Harris, went to the said mine, and when some of these defendants and their laborers went as usual to said lot or mine, they found the said *Charles Bracken*, John Bracken and Lott Harris had drawn the mining tools of the defendants out of the shaft in which the defendants had been at work, and moved them some distance from the shaft. *Charles Bracken* then said to defendants that he had taken possession of the ground in his own right and intended keep

ing possession; and then removed the windlas of defendants from the shaft, and placed another windlas there belonging to himself or some other person. *Bracken* claimed the possession by his own right as owner of the soil. After some verbal altercation said *Charles Bracken*, John Bracken and Lott Harris left the ground, and defendants continued in possession to work as usual.

The defendants attended upon the justice in the forcible entry and detainer case which plaintiffs discontinued, and immediately commenced a second prosecution, which was tried and a verdict rendered for the defendants; the complainant thereupon issued a writ of certiorari to remove the proceedings to the district court of Iowa county, where the same was pending. After the trial of this case, the defendants removed a large quantity of ore which they had raised to the wash place, and notified said *Bracken* and the agent of the owners, that the same was ready for division and market, which was taken by said *Bracken* and complainants by a writ of replevin.

The defendants say that those of them who own the said lot and discovery and who were not on the said lot and premises when the said discovery was first made, came into possession by purchase for a valuable consideration, and that they all claim under Andrew Remphrey, who leased in good faith from the said *Charles Bracken*, and had a right by common custom to dig on such ground without such express consent. That they purchased in good faith, and have strictly complied with the terms of the letting to said Remphrey. Have never been in possession of any part of said premises set forth in the bill, except the said lot and discovery; and that they have a right to the possession of said lot as long as they comply with the terms of the lease aforesaid, and faithfully work said lot as they have always done. And they deny that the said *Charles Bracken* was at any time after the said copper discovery in the quiet and peaceable possession of the said lot and discovery thereon, or that he was ever forcibly expelled therefrom, but that defendants and

Andrew Remphrey, under whom they claim, have been in the possession of said lot and discovery from the time the said lot was taken up and discovery made to the present time ; and if that possession has not been peaceable it was owing to the unlawful and dishonest acts of one of the complainants ; and that *Bracken* always had the option of purchasing the said ore, on due notice. Nor did they ever threaten to remove the judgment in the case of forcible entry and detainer by certiorari, for they did not suppose a judgment would ever be rendered against them.

*Bracken*, in his petition to the court of Iowa county respecting the injunction, represents, that being the owner in fee of the equal, undivided one-third part of the said tract of land, and having the agency and charge of the other two-thirds, which were owned in fee by said *Irvin* and *Daniels'* heirs, he gave to Andrew Remphrey verbal permission to dig, etc.

Andrew Remphrey states in his deposition, that he asked *Charles Bracken* if the piece of land he wanted was the piece which William Henry was promised, and he said no. Then asked *Bracken* if he could have it, and he said yes. Witness asked him the terms, and he said he would let it for one-fifth, and give him the privilege of the copper ; then witness said provided you give as much as any other person, and the only word he made in reply was, certainly. About the limits of the land we did not finally agree then, but *Bracken* promised to meet witness on the ground. About four or five weeks after, *Bracken* met witness on the ground ; they hauled witness up out of the shaft, and he said, Andy, what way do you want your limits ; witness replied 200 yards east from that stump, 100 yards north therefrom, 100 yards south. *Bracken* notified witness not to assign this lease or privilege. Witness assigned it to *Preston* in writing before suits were commenced.

Richard Crocker states in his deposition about the same in substance as contained in Remphrey's deposition

Vol. I.—38.

respecting the contract. Curtis Beech also states the same in substance. It appears in evidence, that *Bracken* and defendants are smelters at different establishments. And in June, 1842, *Preston*, one of the defendants, said he was willing to give $16 per thousand for the one-fifth of the ore then on hand, or take the same for the four-fifths, of which *Bracken* was informed. It also appears that they waited for *Bracken's* decision in the matter, whether he would give or take, on this proposal. It also appears in proof that *Bracken* entered upon the ground in July, 1842, in company with others, when he made a claim of possession, and notified the defendants to quit; and that the defendants continued in the uninterrupted possession. In June or July, 1842, *David Irvin* authorized Curtis Beech to act as his agent and to receive his dues and that he did so for a short time, and sent a hand to see the ore divided, by putting one-fifth in one pile and four-fifths in another ; and that, before the commencement of suits, the ore was raised in great quantities and regularly divided.

The bill presents a case of trespass with a *continuando*, and prays for a preliminary injunction, to prevent the defendants from committing irreparable injury to the premises during the pendency of a prosecution for forcible entry and detainer. It also prays for a final decree for surrender of the premises ; for an account ; and that the complainants may be quieted in their title and possession. The defendants allege and prove that they are in possession of the mine, claiming the right. What right the defendants have to the possession it is not necessary in this case to determine ; whether there is a lease or a license between the parties, or whether it was a mere contract for personal service on the land of the complainants, we will not stop to consider.

From an examination of the authorities upon the subject, it appears, that an injunction lies to restrain a trespass, in order to quiet the possession ; or where there is danger of irreparable mischief, or where the value of

the inheritance is put in jeopardy by a continuance of the trespass. The foundation of this jurisdiction in equity, is the probability of irreparable mischief ; the inadequacy of pecuniary compensation ; and the prevention of a multiplicity of suits. In ordinary trespasses, or where the courts of law can afford complete satisfaction, equity · refuses to interfere, and will rarely and under very peculiar circumstances entertain jurisdiction in actions of tort. *Yancy v. Downer*, 5 Litt. 9 ; *Stevens v. Beekman*, 1 Johns. Ch. 319 ; *Livingston v. Livingston*, 6 id. 497 ; *Jerome v. Ross*, 7 id. 315 ; *Painting Establishment v. Fitch*, 1 Paige, 97 ; 6 Vesey, 147 ; 7 id. 305 ; 8 id. 89 ; 10 id. 290 ; 17 id. 128–281 ; 18 id. 180 ; Eden on Inj. 136, 137, 138, 139 ; Fonblanque's Equity, 3 and notes ; 31 and notes ; 50 and notes ; Story's Eq. 209. And this power of equity, when exercised, is by means of injunction.

Trespass in digging mineral or mining on the land of another, comes within the cognizance of a court of equity, when committed by a mere trespasser, or where a party exceeds the limited rights with which he is clothed.

Every bill must contain within itself sufficient matter of fact, *per se*, to maintain the case of the plaintiff ; and the proof must be according to the allegations of the parties. *Harrison v. Nixon*, 9 Pet. 483. The plaintiffs in this case, acknowledge themselves out of possession. The bill sets forth : "That after the copper mine had been discovered and worked, and after large quantities of copper ore had been raised, the defendants, without law or right, and contrary to the will of complainants, entered and took possession of said tract on or about the 25th day of June, 1845, and continued therein until the 20th of July of the same year, and refused to permit the complainants to take the possession of, or in any manner occupy or enjoy that portion of said tract embracing said copper mine ; and during all that time took and carried away large quantities of copper ore ; and during all that time converted to their own use the whole of the

products of said copper mine : and that on the 20th of July, 1842, the said *Charles Bracken* having quietly and peaceably taken possession of said tract of land and copper mine, and having left his agent in possession of the same, who was quietly and peaceably holding the same by authority of said *Bracken*, and for his use and benefit, the defendants with force and arms, and with strong hand, unlawfully and forcibly did again enter upon said land and expel the said agent therefrom, and again took possession of the same ; and refused to permit complainants to enter upon the same and occupy said copper mine or take the copper ore ; but have converted and are converting the same to their own use, and retain the possession thereof."

The policy of preventing irreparable injury has introduced an exception to the general rule in cases of waste, or of mischief analogous to waste, but this does not extend to questions of title. 1 Smith's Ch. 595 ; *Morphett v. Jones*, 19 Vesey, 350. The complainants in cases of waste must, generally, have the possession of the premises, or have established their right at law, or have brought an action to recover the possession, or in cases of tenants, after notice to quit. 1 Smith's Ch. Pr. 593 ; 3 Barb. & Harrington's Dig. 478, 479 ; *Scott v. Wharton*, 2 Hen. & Munf. 25 ; *Duvall v. Waters*, 1 Bland. 576 ; 2 Story's Eq. 177, 207 ; *Hart v. The Mayor of Albany*, 3 Paige, 213. In such cases courts are generally cautious, and they will not grant relief when the complainant is out of possession. In cases of this nature courts make a great difference between restraining a defendant from working a mine already opened, and restraining him from opening one. *Gray v. Duke of Northumberland*, 13 Vesey, 236. And it is held in many cases referred to on pages 51 and 52 of Fonblanque's Equity, that the plaintiff's exclusive right must be admitted by the defendant or established at law, to warrant the interference of a court of chancery.

No injunction will be allowed, in cases of trespass, with an account, where the plaintiffs cannot maintain an action

at law for mesne profits. In 6 Bacon's Abr., title Trespass, page 566, it is stated, that " only the person who has the possession in fact of real property to which an injury has been done, can maintain an action of trespass *quare clausum fregit;* a general property not being in the case of real property, as it is in the case of personal, sufficient to found this action upon." Also in *Meghan v. Mills,* 9 Johns. 64; *Corfield v. Coryell,* 4 Wash. C. C. 371. After entry the owner may have trespass *quare clausum fregit,* but not before. 17 Pick. 263 ; 17 Mass. 282. A person disseized cannot maintain trespass. 10 Pick. 171. Trespass would probably lie for the entry and ouster of the plaintiff ; but damages can only be recovered for the simple entry and ouster, and not for the continuance of the trespass. Damages for the continuance are not recoverable until after plaintiffs have gained possession. *Holmes v. Seely,* 19 Wend. 507 ; *Mather v. The Trinity Church,* 3 Serg. & Rawle, 509 ; *Brown v. Caldwell,* 10 id. 114; *Demott v. Hagerman,* 8 Cow. 220 ; 6 Serg. & Rawle, 476.

When a bill seeks an account of ore dug the court of chancery will decree it in a proper case, *Bishop of Winchester v. Knight,* 1 P. Wms. 406 ; because the working of a mine is a kind of trade, *Story v. Lord Windsor,* 2 Atkyns, 630 ; *Marquis of Lansdowne v. Marchioness of Lansdowne,* 1 Mad. 73, but the plaintiff must show his possession. *Lyn v. Pierce,* 5 Vesey, 259. "Neither will equity, in all cases, decree an account of mesne profits ; for where a man has title to the possession of lands, and makes an entry, whereby he becomes entitled to damages at law for the time that possession was detained from him, he shall not after his entry, turn that action at law into a suit in equity, and bring a bill for an account of the profits, except in the case of an infant, or some other very particular circumstances, which extend to all those cases that involve an equity which cannot be made available at law." Fonbl. Eq. 31, 32.

Although the defendants have not shown a legal right

to the possession, we cannot decree a surrender, for it is not the practice of this court to determine the legal rights of the parties, and make such a decree. A court of chancery does not possess any direct jurisdiction over legal titles. The court may, perhaps, try titles to lands, when they arise incidentally; but it is understood not to be within its province. The power is only to be exercised in difficult and complicated cases, affording peculiar grounds for equitable interference. *Abbott v. Allen*, 2 Johns. Ch. 524. If the case be clear, a court of equity will interfere to quiet the title to land (*Alexander v. Pendleton*, 8 Cranch, 462); but the plaintiffs must be in possession of the land. The injunction to yield up or quit possession of land is a judicial writ, and subsequent to a decree in the nature of a writ of execution. It is sometimes used in aid of a judgment at law. It is always issued in aid of a decree in chancery, in putting a purchaser into possession, and is followed by a writ of assistance. Eden on Inj. 261; Story's Eq. 226, 227; *Kershaw v. Thompson*, 4 Johns. Ch. 609. This injunction is never granted in a case like the one now under consideration.

So if a bill should be brought for the possession of land, which is commonly called an ejectment bill, it would be demurrable, for the proper redress is at law. And even if such bill should charge that the defendant had gotten the title deeds and mixed the boundaries; and should, on that ground, pray for a discovery, possession, and account, a demurrer (at least upon the doctrine maintained in England) would lie. For although the plaintiff would be entitled to the discovery of the title deeds, yet he would not have any title to the relief; that after the discovery being properly given, it is at law; and by praying relief as well as discovery, his whole bill would be demurrable; Story's Eq. Pl. 374, 375, and cases there cited.

The court is not willing to exercise its chancery jurisdiction, unless in clear cases properly presented, and in which it satisfactorily appears, that full and complete

justice cannot be had at law. In this case it appears that *Bracken,* one of the complainants, assumed to act for himself and the other complainants, in letting the mine and making the contract with Remphrey for working it. The other complainants did not dispute *Bracken's* authority to act in the premises. They desired the mine to be worked for their own interest, and put Remphrey into possession, who transferred his possession to these defendants, who continued to work the mine as Remphrey had worked it. Now it cannot be made satisfactorily to appear, that this is a case of such irreparable injury as would entitle the complainants to the aid of this court on this bill. The defendants allege and prove that they are in the actual, exclusive and adverse possession of the mine, claiming the right. It fully appears that *Charles Bracken* made an ineffectual effort to regain the possession. Hence, it is apparent that this presents a case wherein full and complete justice can be done in an action at law. Ejectment is the proper remedy, with a preliminary or interlocutory injunction, to stay waste, upon a proper bill, during the pendency of the action ; and after the recovery, an action of trespass for the mesne profits. But it is contended, that inasmuch as the complainants are not invested with the legal title to the premises, by a patent from the United States, an action of ejectment cannot be maintained. The patent is not an indispensable muniment of title for this purpose. The act making receiver's receipts evidence will enable the plaintiffs to recover possession of the land in ejectment. Between individuals the receiver's receipt, under this statute, is recognized as legal evidence of title, but not against the United States. *Wilcox v. Jackson,* 13 Pet. 516.

It is therefore considered and adjudged by the court, that the decree of the district court of Milwaukee county, dismissing complainant's bill, be and the same is hereby affirmed, with costs.

Judge IRVIN was a party to this action and did not participate in the hearing or decision.